JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Noel Koenke

**(b)** County of Residence of First Listed Plaintiff    Tarrant County, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Justin F. Robinette, Esq., The Law Offices of Eric A. Shore, P.C.
2 Penn Center, 1500 JFK Blvd, Suite 1240, Philadelphia, PA 19102
(215) 944-6121

## DEFENDANTS

Saint Joseph's University

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                     *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.
Brief description of cause:
Sexual harassment, constructive discharge, etc.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
10/11/2019

SIGNATURE OF ATTORNEY OF RECORD
*Justin F. Robinette*

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Southlake, Texas (but should be contacted in this case only at undersigned counsel's address)

Address of Defendant: 5600 City Ave., Philadelphia, PA 19131

Place of Accident, Incident or Transaction: 5600 City Ave., Philadelphia, PA 19131

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☒

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/11/19                   _____                   319829
                          *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

CIVIL: (Place a √ in one category only)

| A. | *Federal Question Cases:* | B. | *Diversity Jurisdiction Cases:* |
|---|---|---|---|
| ☐ 1. | Indemnity Contract, Marine Contract, and All Other Contracts | ☐ 1. | Insurance Contract and Other Contracts |
| ☐ 2. | FELA | ☐ 2. | Airplane Personal Injury |
| ☐ 3. | Jones Act-Personal Injury | ☐ 3. | Assault, Defamation |
| ☐ 4. | Antitrust | ☐ 4. | Marine Personal Injury |
| ☐ 5. | Patent | ☐ 5. | Motor Vehicle Personal Injury |
| ☐ 6. | Labor-Management Relations | ☐ 6. | Other Personal Injury *(Please specify):* _____ |
| ☒ 7. | Civil Rights | ☐ 7. | Products Liability |
| ☐ 8. | Habeas Corpus | ☐ 8. | Products Liability – Asbestos |
| ☐ 9. | Securities Act(s) Cases | ☐ 9. | All other Diversity Cases |
| ☐ 10. | Social Security Review Cases | | *(Please specify):* _____ |
| ☐ 11. | All other Federal Question Cases | | |
| | *(Please specify):* _____ | | |

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Justin F. Robinette, Esquire , counsel of record *or pro se plaintiff*, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 10/11/19                   _____                   319829
                          *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5 2018)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
| Noel Koenke | : | CIVIL ACTION |
|  | : |  |
| v. | : |  |
|  | : |  |
| Saint Joseph's University | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.           ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
 and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
 exposure to asbestos.                                     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
 commonly referred to as complex and that need special or intense management by
 the court. (See reverse side of this form for a detailed explanation of special
 management cases.)                                       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (X)


| 10/11/19 | Justin F. Robinette, Esquire | Plaintiff, Noel Koenke |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 944-6121 | (215) 944-6124 | justinr@ericshore.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

NOEL KOENKE,

                         Plaintiff,

        v.

SAINT JOSEPH'S UNIVERSITY,

                         Defendant.

Case No. _____

## **COMPLAINT**

### **PARTIES**

1.      Plaintiff, Noel Koenke, is an adult individual, and currently a citizen of the State of Texas.

2.      Defendant, Saint Joseph's University, was, at all times relevant hereto, a private university that employed the Plaintiff.  Defendant has a principal place of business at 5600 City Ave., Philadelphia, PA 19131.

### **JURISDICTION AND VENUE**

3.      This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the claims present a federal question.

4.      This Court has jurisdiction over Defendant because Defendant's contacts with this state and judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the Supreme Court of the United States in International Shoe Company v. State of Washington, 326 U.S. 310 (1945), and its progeny.

5.     Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because Defendant resides in and/or conducts business in this judicial district, and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

6.     At all times relevant hereto, Defendant received Federal financial assistance for its education programs and activities, received such assistance for the purpose of providing employment for said education programs and activities, and is covered under Title IX of the Education Amendments of 1972 ("Title IX").

7.     The Third Circuit Court of Appeals has recently held that Title IX is a remedy for employment discrimination in addition to Title VII of the Civil Rights Act of 1964 ("Title VII"). See Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545, 557 (3d Cir. 2017).  In the Third Circuit, Title IX clearly covers sexual harassment claims brought in the employment context.  Id.

8.     According to the Title IX Legal Manual of the United States Department of Justice, "Unlike Title VI which covers employment only in limited circumstances, Title IX clearly covers employment discrimination."  See "Overview of Title IX:  Interplay with Title VI, Section 504, Title VII, and the Fourteenth Amendment," Title IX Legal Manual, United States Department of Justice, available at [https://www.justice.gov/crt/title-ix#77] (Last Accessed Oct. 11, 2019).  The "substantive standards and policies developed under Title VII to define discriminatory employment conduct apply with equal force to employment actions brought under Title IX," and when "a plaintiff complains of discrimination with regard to conditions of employment in an institution of higher learning, the method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case."  Id.

9.     Mr. Thomas Sheibley, Plaintiff's former supervisor who, among others, personally participated in the discriminatory and harassing acts on behalf of the University as

2

described herein, is, according to Defendant's website, currently the Deputy Title IX Coordinator

for all of the Defendant University's students (with the other Title IX Deputy Coordinator

covering athletics).

**COUNT I:**
**SEXUAL HARASSMENT / HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**20 U.S.C. § 1681, <u>et seq.</u>**
**<u>(Plaintiff, Noel Koenke v. Defendant, Saint Joseph's University)</u>**

10.     All of the foregoing paragraphs are hereby incorporated by reference as if the

same were more fully set forth herein at length.

11.     Plaintiff identifies as a lesbian female.

12.     Plaintiff was hired by Defendant in or around July 2010 as Coordinator for

Liturgy and Music.  Plaintiff was promoted in or around May 2016 to the position of Assistant

Director for Music and Worship.  Plaintiff's performance evaluations reflected that her

performance was commendable and "exceed[ed] expectations."  Plaintiff was beloved by the

students she served during her tenure.  Plaintiff also completed a Master's Degree in Pastoral

Care from La Salle University while Plaintiff was working for Defendant.

13.     At all times relevant hereto, in or around 2013, the "Definitions" section of

Defendant's policy for Campus Resources, Human Resources, "Prohibiting Discrimination,

Harassment, and Retaliation," explicitly stated, "For purposes of applying this policy, 'sexual'

harassment includes conduct that is of a sexual nature or related to a person's gender and may

include persons of the same sex … Harassment on the basis of one's sexual orientation can also

constitute discrimination on the basis of sex.'" <u>See</u> Campus Resources, Human Resources,

"Prohibiting Discrimination, Harassment, and Retaliation," Definitions, at p. 1 (2013).

Defendant's conduct as described herein violated Defendant's own written policy, and although

3

Defendant condemned such conduct in its own written policy, Defendant nevertheless

perpetrated the hateful and harassing conduct described herein against the Plaintiff, and for

which the Plaintiff therefore seeks to recover.

14.     Under the seminal case of <u>Bollard v. California Province of the Society of Jesus</u>,

196 F.3d 940 (9th Cir. 1999), the ministerial exception does not apply to sexual harassment and

abuse, including of the type suffered by Plaintiff at the hands of her employer.  <u>See Bollard v.</u>

<u>California Province of the Society of Jesus</u>, 196 F.3d 940, 947-48 (9th Cir. 1999).  The <u>Bollard</u>

case involved same-sex sexual harassment and constructive discharge.  <u>Id.</u>  The <u>Bollard</u> court

held that the "rationale" for the ministerial exception "does not apply here, for the Jesuits

most certainly do not claim that allowing harassment to continue unrectified is a

method of choosing their clergy." <u>Id.</u> at 944.  The <u>Bollard</u> case clearly recognized that, "Instead,

constructive discharge in the context of Bollard's . . . sexual harassment claim functions

only to signal his estimation of the severity of the harassment and to lay the foundation for

including lost wages in a calculation of damages."  <u>Id.</u>

15.     Defendant already selected Plaintiff for hire and chose Plaintiff as Defendant's

representative.  The University itself voluntarily opened the job to an LGBT person.  There were

not any terms or conditions, at this time, placed upon Plaintiff regarding Plaintiff's sexual

orientation.  Once having hired Plaintiff, Defendant does <u>*not*</u> have free rein to continuously

discriminate against, harass, and abuse Plaintiff based on her sexual orientation with impunity.

This is inconsistent with Defendant's own written policy prohibiting discrimination based on

sexual orientation as being a form of "sexual" harassment.  The ministerial exception applies to

the method of selecting clergy, and not sexual harassment or abuse, consistent with <u>Bollard</u>.

16.     Throughout Plaintiff's employment, Plaintiff was subjected to sexual harassment – hateful and harassing conduct that was based on sex, gender, and/or gender stereotyping. The harassment was severe and/or pervasive. The harassment consisted of the following:

    a.      On or about July 12, 2013, Plaintiff's male supervisor, Mr. Thomas
            Sheibley, Director of Campus Ministry, came into Plaintiff's office, shut
            the door, and stated that Mr. Sheibley needed to speak to Plaintiff then.
            Mr. Sheibley informed Plaintiff that the Defendant's administration was
            asking for Plaintiff not to be public, from that point moving forward, about
            Plaintiff's relationship with and upcoming marriage to a person of the
            same sex (female). Plaintiff recollects that Mr. Sheibley told Plaintiff, for
            example, that Plaintiff should delete her current Facebook account, create
            a new Facebook account, but not add any of the employees of Defendant's
            University to be Plaintiff's Facebook friends. Plaintiff felt not only that
            she could not be fully open at work, but also that she could not always be
            fully open outside of work about Plaintiff's employment, or relationship
            with and upcoming marriage to a person of the same sex (female), to be
            consistent with the University's request.

    b.      Plaintiff cried during the meeting with Plaintiff's supervisor, Mr. Sheibley,
            on July 12, 2013, and Plaintiff stated to Mr. Sheibley, "It feels like I'm
            being asked to go back into the closet," or words to that effect. Mr.
            Sheibley agreed this was what it appeared the University was asking
            Plaintiff to do, by stating, "I know that's how this seems," or words to that
            effect. Mr. Sheibley stated to Plaintiff that it was not Mr. Sheibley's

personal decision, but that Mr. Sheibley was being required to deliver the request to Plaintiff from the University.

c.   Based on the fact that Defendant had Plaintiff's supervisor deliver the message on behalf of Defendant, this harmed the relationship between Plaintiff and Plaintiff's supervisor, on a frequent basis, during Plaintiff's employment, moving forward.  Plaintiff's supervisor was no longer felt to be her mentor after this.  Plaintiff intentionally limited Plaintiff's interactions with Plaintiff's supervisor moving forward.  This made it extremely difficult for Plaintiff.

d.   Plaintiff generally knew which of her coworkers were married because they were permitted to speak openly about their personal lives at work. Plaintiff recollects that, in or around the same timeframe, co-employee, Ms. Beth Ford, was marrying a person of the opposite sex (male), and was permitted to tell Defendant's students and employees including Plaintiff about this fact.  Ms. Ford did not have a sit-down with her supervisor where Ms. Ford was asked to be discreet.  Ms. Ford was permitted to be fully open.  As a result, Plaintiff suffered emotional pain and humiliation about her own situation.

e.   On or about July 12, 2013, following Plaintiff's meeting with Plaintiff's supervisor, Mr. Sheibley, Plaintiff reported the conduct to Mr. Springs Steele, Vice President for Mission and Identity, who stated to Plaintiff, "That wasn't handled well," or words to that effect.

6

f.  On or about July 17, 2013, Plaintiff had another meeting with Plaintiff's supervisor, Mr. Sheibley, who confirmed that Plaintiff could not be fully open and should be discreet, or words to that effect, from that point moving forward, about who Plaintiff told, and regarding who would find out about Plaintiff's relationship with and upcoming marriage to a person of the same sex (female).

g.  On or about July 22, 2013, Plaintiff met again with Mr. Springs Steele, Vice President for Mission and Identity, and Plaintiff told Mr. Steele that Plaintiff was experiencing stress and anxiety on account of the fact that the University's request of Plaintiff not to be public was unclear, or words to that effect.  Plaintiff stated to Mr. Steele that Plaintiff would feel more comfortable if she had something in writing from the University moving forward about Plaintiff's job security, and Plaintiff asked Mr. Steele for clarification in writing about what Plaintiff was allowed to do, and what Plaintiff was not allowed to do, with regard to how Plaintiff was supposed to act as an employee, or words to that effect.  Mr. Steele seemed dismissive and responded, "Well, good luck with that," "You're not going to get that," or "You'll never get that in writing," or words to that effect.

h.  The next day, on July 23, 2013, Plaintiff filed a formal written complaint of discrimination, by e-mail, with Ms. Susan Eisenmann, Vice President of Human Resources.  Later the same day, on July 23, 2013, Plaintiff and Ms. Eisenmann had an in-person meeting to discuss Plaintiff's complaint.

During the meeting, Ms. Eisenmann explained that what Plaintiff was experiencing was not discrimination.

i.   On <u>August 5, 2013</u>, Ms. Eisenmann, Vice President of Human Resources, wrote and delivered a letter to Plaintiff confirming that Defendant did not consider what Plaintiff was experiencing to be discrimination.  And, although Ms. Eisenmann confirmed that Plaintiff was not being terminated at that time, Plaintiff was required to abide by the terms and conditions imposed by Defendant moving forward.

j.   The Defendant's hateful and harassing conduct toward Plaintiff tormented Plaintiff and was a stress factor that caused her to attempt suicide approximately six (6) days later, on or about <u>August 11, 2013</u>.  Plaintiff was hospitalized following the suicide attempt.  The medical record for Plaintiff's hospitalization states that Plaintiff's depression and suicide attempt were allegedly due to, in part, "job stress."  Plaintiff was asked by her providers to indicate the "places" which were Plaintiff's "triggers," and Plaintiff indicated one (1) such place – "Work."  Plaintiff was seriously damaged by the harassment and abuse Plaintiff experienced in being required to remain closeted or hide Plaintiff's relationship with and upcoming marriage to a person of the same sex (female), for fear of the negative consequences or repercussions if Plaintiff was suspected or found out.

k.   To attempt to comply with the University's request regarding the Plaintiff's Facebook account, Plaintiff did go through Plaintiff's Facebook

8

friends and remove any of Plaintiff's Facebook friends from Saint
Joseph's University, except for a limited number who Plaintiff specifically
selected because Plaintiff believed they would not have a problem with
someone being in a relationship with or married to a person of the same
sex (female).

l.     Throughout Plaintiff's employment, on a frequent basis, Plaintiff recalls
specifically refraining or stopping herself from using pronouns of the same
gender to describe Plaintiff's wife at the time, in certain conversations at
work, such as with certain co-employees, faculty and staff members,
Board members, and visitors.  Plaintiff constantly had to determine who
might disapprove, and then act accordingly.  Plaintiff frequently caught
herself and frequently corrected herself from referring to Plaintiff's wife at
the time as "she" or "her."  Plaintiff recalls, for example, an occasion
where Plaintiff remembered mid-sentence that Plaintiff needed to avoid
using "she" or "her" on that occasion at work when referring to Plaintiff's
wife at the time.

m.     Plaintiff also recalls occasions where Plaintiff would intentionally adopt
the pronouns "he" or "him" to specifically refer to Plaintiff's wife at the
time.

n.     Plaintiff further recalls that there were frequent occasions where Plaintiff's
wife at the time would be referred to as "he" or "him" by others, assuming
that Plaintiff was married to a man instead of a woman, and Plaintiff
would not correct the assumption, and instead go along with it

9

intentionally, for fear of the negative consequences or repercussions if Plaintiff was suspected or found out.  With respect to the above, including sub-sections (l) through (n), Plaintiff did come out to a certain number of select co-employees with whom Plaintiff worked closely as it is difficult if not virtually impossible to remain closeted at all times and around every single person.

o.   Plaintiff recollects that, during Plaintiff's employment, a male priest saw Plaintiff speaking to another woman, and he approached Plaintiff and wanted to know specifically whether Plaintiff had a conversation about Plaintiff's same-sex partner, and if Plaintiff did, then how exactly Plaintiff went about the conversation, or words to that effect.  Plaintiff responded that Plaintiff went along with the person's assumption that Plaintiff was engaged to a man, or words to that effect.  Plaintiff did so out of fear of the negative consequences or repercussions if Plaintiff was suspected or found out.  Plaintiff recollects that the response was, "That's good that you did that," or "That was a good choice," or words to that effect.  Plaintiff recalls feeling sick.  In addition, Plaintiff had to make a mental note that this particular woman believed Plaintiff was going to be married to a man, in order to keep up the appearance moving forward.  Plaintiff recalls seeing this particular woman, thus having to keep up such an appearance, on multiple separate occasions.

p.   On another separate occasion, Plaintiff recalls that a woman who was a donor at a campus event saw Plaintiff's ring and asked a series of

questions like, "What's his name?" and "What does he do?", assuming that Plaintiff was getting married to a man.  Plaintiff did not correct the assumption intentionally.  Plaintiff again had to make a mental note that this person believed Plaintiff was going to be married to a man, so Plaintiff would have to keep up this appearance with the person moving forward.

q.    During Plaintiff's employment, following news of an employee of a local Catholic high school, the Waldron Mercy Academy, terminating the employment of Ms. Margie Winters, on account of Ms. Winters' marriage to a person of the same sex (female), a co-employee approached Plaintiff during work hours, and asked Plaintiff if Plaintiff was concerned about Plaintiff's own employment, or words to that effect.  Plaintiff felt isolated, singled out, and feared for the negative consequences or repercussions if Plaintiff was suspected or found out.

r.    During Plaintiff's employment, Plaintiff recollects that a co-employee who is a gay male, and who subsequently left Saint Joseph's University, stated to Plaintiff, on multiple occasions, that the co-employee no longer wanted to hide the co-employee's relationship with his boyfriend moving forward, or words to that effect.

s.    During Plaintiff's employment, Plaintiff recollects that another co-employee who was a lesbian stated to Plaintiff that the co-employee saw everything that the Plaintiff was going through at Saint Joseph's University, and therefore the co-employee decided that the co-employee

11

was "not going to come out," or words to that effect.  This again caused

Plaintiff emotional pain and fear for the negative consequences or

repercussions if Plaintiff was suspected or found out.

t.      Plaintiff recollects that Plaintiff was forwarded a document by a priest on

staff at Saint Joseph's University, in or around July 2016, which indicated

that anyone living an "openly same-sex lifestyle" could not have a

leadership role, or words to that effect.

u.      Plaintiff also recollects being approached during Plaintiff's employment

by a co-employee and asked specifically whether Plaintiff was aware of

the above document stating that anyone living in a same-sex relationship

could not have a leadership role, or words to that effect.

v.      Plaintiff's stress and fear of the negative consequences or repercussions if

Plaintiff was suspected or found out also extended to non-work-related

activities, on non-work-related time, because Plaintiff felt she could not

always be fully open outside of work about Plaintiff's employment, or

relationship with and marriage to a person of the same sex (female), on

account of Defendant's conduct.

w.      Plaintiff also recollects that Plaintiff declined to attend after-hours social

activities with coworkers, or attended and then left as quickly as possible,

continuing throughout the last year of Plaintiff's employment in 2016-

2017.

x.      In or around Summer 2017, Plaintiff was scheduled to cover an orientation

session attended by parents of students immediately following a Parent

Resource Fair.  Plaintiff recollects being approached by Plaintiff's supervisor, Mr. Sheibley, who stated to Plaintiff that a parent had asked whether Defendant "taught anything that wasn't in line with Catholic teaching concerning LGBT issues," or words to that effect.  Plaintiff felt isolated and singled out based on Plaintiff's sexual orientation because Plaintiff felt Mr. Sheibley wanted to ensure that Plaintiff would not be suspected or found out during the session.

y.    Plaintiff recalls that, frequently during Plaintiff's tenure, Plaintiff intentionally limited her participation in events which involved LGBTQ+ issues, such as, for example, Unity Week, Speak Out, or Gay-Straight Alliance ("GSA") events, for fear of the negative consequences or repercussions.

z.    In or around 2016, Plaintiff recollects that one of the Defendant's administrative assistants approached Plaintiff, in a concerned manner, and stated that Public Safety was downstairs.  The assistant did not specifically provide any reason why Public Safety would have been called.  Plaintiff had not called them.  Plaintiff was not aware of any explanation for why Public Safety would have been present.  Plaintiff actually thought momentarily that Plaintiff's employment was over, and Plaintiff was going to be officially escorted off campus.

aa.   Plaintiff recalls, in or around July or August 2017, before Plaintiff's leave of absence which preceded her constructive discharge, Plaintiff was at a conference on campus where Plaintiff observed the presenters were free to

13

discuss their personal lives at work in a way Plaintiff was not.  Plaintiff

described feeling "overcome with sadness" on this specific occasion.

Plaintiff also felt she could not tell anyone at work how Plaintiff felt for

fear Plaintiff would be suspected or found out.

bb.　　To add insult to injury, Plaintiff recalls, in or around July or August 2017,

Plaintiff believes around the same timeframe as the above conference, and

Plaintiff believes possibly during the same week, Plaintiff was asked by an

intern to go to dinner with the intern and their family member.  Plaintiff

found herself again having to hide the fact that Plaintiff identified as a

lesbian.

cc.　　Additionally, Plaintiff recalls, in or around the same timeframe of July or

August 2017, Plaintiff felt she could not be fully open at a work-related

lunch meeting held outside of the office and at Plaintiff's supervisor, Mr.

Sheibley's, request, on account of the presence of a newly hired employee.

Plaintiff, a co-employee, and a newly hired employee went out to a lunch

meeting together at their supervisor, Mr. Sheibley's, request.  The co-

employee who attended the lunch meeting with Plaintiff was the same co-

employee, as above, who stated to Plaintiff that the co-employee was "not

going to come out" on account of what Plaintiff was going through at

Saint Joseph's University, or words to that effect.  It could not necessarily

be determined whether the newly hired employee was comfortable with

people who are LGBTQ+.  To Plaintiff it was understood that Plaintiff

was not to mention Plaintiff's then-wife intentionally, and Plaintiff felt

14

like the conversation was intentionally steered away from Plaintiff's then-wife, as well as the co-employee's personal life, and anything involving personal lives outside of work, on account of the new hire being present.

dd.    The difficulty in trying to maintain a secret double-life by incessantly navigating who to tell and who not to tell, both inside and outside of work, took an immense psychological toll on the Plaintiff.

ee.    Plaintiff requested and was approved for a leave of absence, under the Family and Medical Leave Act ("FMLA"), for Plaintiff's own serious health condition – specifically, for "PTSD [Post-Traumatic Stress Disorder] related trauma" – on account of the harassment Plaintiff suffered.  Plaintiff's leave of absence was scheduled to begin in or around August 14, 2017.

ff.    Plaintiff received partial hospitalization care from on or about August 17, 2017 through September 6, 2017, and was also hospitalized for an inpatient stay from on or about September 7, 2017 through September 11, 2017, all during Plaintiff's leave of absence preceding the Plaintiff's constructive discharge.  Plaintiff underwent therapy for trauma with a focus specifically on sexual orientation and identity issues.  The therapist emphasized that what Plaintiff was being asked to do by Defendant was damaging and not conducive to Plaintiff's psychological well-being.

gg.    Plaintiff's then-spouse of the same sex (female), from the Plaintiff's remarriage, actually stated to Plaintiff, "I will divorce you if you go back there" – meaning, Saint Joseph's University – and, "I can't stand to see

15

you continue to suffer like this," or words to that effect, in or around late 2017, during Plaintiff's leave of absence preceding the Plaintiff's constructive discharge.

hh.   On or about October 23, 2017, Plaintiff reached out to Ms. Eisenmann, Vice President of Human Resources, before Plaintiff's scheduled return-to-work date.  Plaintiff had tentatively scheduled to return to work on November 6, 2017.  Plaintiff and Ms. Eisenmann scheduled a meeting for November 3, 2017.

ii.   On or about November 3, 2017, Ms. Eisenmann and Plaintiff met, and Plaintiff stated to Ms. Eisenmann that Plaintiff did not wish to return to work under the terms and conditions being currently imposed, or words to that effect.  Plaintiff recollects that Plaintiff stated to Ms. Eisenmann that Plaintiff felt that Saint Joseph's University was "not a safe environment," or words to that effect.  Plaintiff also specifically told Ms. Eisenmann about the particular impact that the conduct was having on Plaintiff's psychological well-being including previously being hospitalized and experiencing emotional distress.  Plaintiff could not return unless on the terms and conditions imposed.  There was an inquiry about a severance and Ms. Eisenmann said she would need to check with the University.

jj.   On or about November 9, 2017, Plaintiff; Mr. Sheibley, Plaintiff's supervisor who had delivered the request for Plaintiff to remain discreet; and Ms. Eisenmann, Vice President of Human Resources, met formally regarding Plaintiff's intent to resign because the terms and conditions

16

imposed on Plaintiff could not be lifted.  Plaintiff did not know

beforehand that Mr. Sheibley was going to be present for the meeting.

Plaintiff had written out a statement beforehand entitled, "My account of

the past 4 years," which Plaintiff read aloud to Ms. Eisenmann and Mr.

Sheibley, during the meeting on November 9, 2017, about Plaintiff's

intent to resign.  Plaintiff stated that Plaintiff felt "stigma in my

workplace," there was "documented concern about my position with

regards to my sexual orientation," "my work environment has not been

safe under these conditions," Plaintiff felt required to "work as someone I

am not," and stating specifically that Plaintiff was struggling with suicide

ideation on account of the Defendant's conduct.  Plaintiff explained that it

took a significant amount of time and energy to navigate or keep up this

secret double-life, and stated, "Am I being discreet enough … what does

that ambiguous phrase mean?  Am I gay or straight today?  Gay or straight

with this person or this group of people?" (ellipsis in original).  Plaintiff

provided a range of examples of a number of different ways that one's

personal life could come up at work, from a "seemingly harmless question

about your spouse," to "what you did this weekend," to a "revelation about

how you have learned to love."  Plaintiff stated, "Asking for discretion

about a life I celebrate and know to be fundamentally good solely because

of my sexual orientation is **harassment**" and a "**hostile work

environment**" (emphasis added).  Plaintiff expressed, "I have lived as two

different people for years," and, "I found myself no longer wanting to

17

live." Plaintiff was constructively discharged from employment at Saint

Joseph's University.

kk. On November 9, 2017, Plaintiff was presented a severance agreement by

Defendant indicating Plaintiff's effective date of resignation was

November 15, 2017. Plaintiff was presented a proposed severance of

seventeen-thousand, eight-hundred dollars ($17,800.00), to release

Defendant from any and all claims including those specifically based on

"employment discrimination or fair employment practices laws, such as

Title VII of the Civil Rights Act of 1964 . . . ," which prohibits sexual

harassment. The agreement also stated that Plaintiff was required to keep

the agreement "completely confidential" including to "local, state, or

federal agencies, members of the press and media, present and former

officers, employees, and agents of Saint Joseph's, and other members of

the public," about, *inter alia*, "the substance or the existence of any belief

that Saint Joseph's allegedly engaged in any unlawful or unfair conduct"

toward the Plaintiff.

ll. Plaintiff was given three (3) choices:  First, Plaintiff could sign the

agreement and return it specifically to Mr. Sheibley, the supervisor

involved.  Second, if Plaintiff did not sign the agreement and did not

return to work, then the University would accept that as Plaintiff's

resignation.  Third, Plaintiff could return to work but only under the

existing terms and conditions imposed.

18

mm.   Plaintiff did *not* sign the agreement.  Plaintiff further rejected the agreement specifically on November 13, 2017, in a letter to Ms. Eisenmann, Vice President of Human Resources, stating, "I am declining your offer of severance as I do not agree with the terms and conditions stated in the Agreement & General Release."  Rather, Plaintiff is pursuing the instant case to ensure that *no* other employee in the future is subjected to hateful harassment and abuse like the Plaintiff was subjected to in this case.

17.   Defendant's conduct constituted hateful sex-based harassment and abuse of Plaintiff.  Defendant intentionally created an extremely hostile place to work for the Plaintiff.

18.   Plaintiff was subjectively offended, and any reasonable person would be objectively offended, by the harassment and abuse described above.

19.   The harassment was severe or pervasive enough to alter the conditions of Plaintiff's work environment.

20.   Mr. Sheibley and Ms. Eisenmann constitute supervisors/managers who created the hostile work environment, and therefore Defendant is subject to vicarious liability for their actions.

21.   Defendant failed to provide prompt and appropriate action to prevent, correct, and remedy the hostile environment complained of by Plaintiff during her employment.

22.   Defendant's conduct caused the Plaintiff trauma and severe emotional distress. Plaintiff was seriously damaged by the abuse she experienced at the hands of Defendant.

23.   Plaintiff has also incurred medical expenses and the costs associated with attending professional counseling.  In total, Plaintiff took four (4) total leaves of absence, due to

Plaintiff's mental health condition, while employed with Defendant, using possibly sick time, vacation time, leave under the Family and Medical Leave Act ("FMLA"), or a combination thereof, but Plaintiff cannot specifically recollect which was used for each period.  Plaintiff needed leaves of absence, due to Plaintiff's mental health condition, as follows:

      a.      In or around February 13, 2011 – February 22, 2011, during which time Plaintiff's treatment focused on acceptance of Plaintiff's sexual orientation, and living authentically;

      b.      From August 11, 2013 – August 19, 2013, following Defendant's statements to Plaintiff for Plaintiff to be discreet and not to be fully open, and indicating that this was not discrimination in response to Plaintiff's complaints about the same;

      c.      In or around October 29, 2014 – November 10, 2014, during which time Plaintiff received treatment for Post-Traumatic Stress Disorder ("PTSD")-related symptoms, which included a screening and clinical trial for a new PTSD medication.  Plaintiff was experiencing panic attacks at the time.  This followed a course of related treatment beginning in or around March 2014.

      d.      Plaintiff also took leave from August 2017 – October 2017 immediately preceding Plaintiff's constructive discharge from Defendant.

24.     Defendant's conduct drove a wedge between Plaintiff and Plaintiff's then-spouse of the same sex (female), from the Plaintiff's remarriage.  Plaintiff is now divorced from her then-spouse.  Plaintiff's then-spouse had actually stated to Plaintiff, "I will divorce you if you go

back there" – meaning, Saint Joseph's University – or words to that effect, in or around late 2017, during Plaintiff's leave of absence preceding the Plaintiff's constructive discharge.

25.    Defendant's conduct has destroyed the Plaintiff's career.  Plaintiff left her career field, left the education field, and moved to a different geographic area.

**WHEREFORE**, Plaintiff, Noel Koenke, demands judgment in her favor and against Defendant in an amount which will fully and fairly compensate Plaintiff for any and all back and front pay and benefits; compensatory damages for pain and suffering, mental anguish, anxiety, depression, humiliation, embarrassment, and severe emotional distress; medical and other related expenses; expenses incurred in attending professional counseling; pre- and post-judgment interest, reasonable attorneys' fees, costs of suit; equitable/injunctive relief requiring that Defendant adopt and enforce a clear and unambiguous policy of anti-harassment which is fully LGBT-inclusive and covers all employees and all forms of sexual-orientation harassment or abuse; requiring training in anti-harassment for all employees which is fully LGBT-inclusive, including training on the fact that all forms of sexual-orientation harassment or abuse constitute sexual harassment or abuse, and that the prohibition on anti-harassment extends to all employees; and requiring Defendant to post notice of the verdict in this matter.

**COUNT II:**
**SEXUAL HARASSMENT / TANGIBLE EMPLOYMENT ACTION**
**IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**20 U.S.C. § 1681, <u>et seq.</u>**
**<u>(Plaintiff, Noel Koenke v. Defendant, Saint Joseph's University)</u>**

26.    All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth herein at length.

27.    Defendant conditioned Plaintiff's continued employment, including her return to work from FMLA leave, on Plaintiff being required to be discreet or not be public about

Plaintiff's relationship with and subsequent marriage to a person of the same sex (female). This constitutes a tangible employment action taken and/or conditioned on acquiescence in sexual harassment and abuse. It should be pointed out further that the FMLA leave was taken due to this very same hateful harassing conduct from the Defendant which seriously damaged Plaintiff emotionally. The facts which support this claim are as follows:

a.    On or about July 12, 2013, Plaintiff's male supervisor, Mr. Thomas Sheibley, Director of Campus Ministry, came into Plaintiff's office, shut the door, and stated that Mr. Sheibley needed to speak to Plaintiff then. Mr. Sheibley informed Plaintiff that the Defendant's administration was asking for Plaintiff not to be public, from that point moving forward, about Plaintiff's relationship with and upcoming marriage to a person of the same sex (female). Plaintiff recollects that Mr. Sheibley told Plaintiff, for example, that Plaintiff should delete her current Facebook account, create a new Facebook account, but not add any of the employees of Defendant's University to be Plaintiff's Facebook friends. Plaintiff felt not only that she could not be fully open at work, but also that she could not always be fully open outside of work about Plaintiff's employment, or relationship with and upcoming marriage to a person of the same sex (female), to be consistent with the University's request.

b.    Plaintiff cried during the meeting with Plaintiff's supervisor, Mr. Sheibley, on July 12, 2013, and Plaintiff stated to Mr. Sheibley, "It feels like I'm being asked to go back into the closet," or words to that effect. Mr. Sheibley agreed this was what it appeared the University was asking

Plaintiff to do, by stating, "I know that's how this seems," or words to that effect. Mr. Sheibley stated to Plaintiff that it was not Mr. Sheibley's personal decision, but that Mr. Sheibley was being required to deliver the request to Plaintiff from the University.

c.      Based on the fact that Defendant had Plaintiff's supervisor deliver the message on behalf of Defendant, this harmed the relationship between Plaintiff and Plaintiff's supervisor, on a frequent basis, during Plaintiff's employment, moving forward. Plaintiff's supervisor was no longer felt to be her mentor after this. Plaintiff intentionally limited Plaintiff's interactions with Plaintiff's supervisor moving forward. This made it extremely difficult for Plaintiff.

d.      Plaintiff generally knew which of her coworkers were married because they were permitted to speak openly about their personal lives at work. Plaintiff recollects that, in or around the same timeframe, co-employee, Ms. Beth Ford, was marrying a person of the opposite sex (male), and was permitted to tell Defendant's students and employees including Plaintiff about this fact. Ms. Ford did not have a sit-down with her supervisor where Ms. Ford was asked to be discreet. Ms. Ford was permitted to be fully open. As a result, Plaintiff suffered emotional pain and humiliation about her own situation.

e.      On or about July 12, 2013, following Plaintiff's meeting with Plaintiff's supervisor, Mr. Sheibley, Plaintiff reported the conduct to Mr. Springs

Steele, Vice President for Mission and Identity, who stated to Plaintiff, "That wasn't handled well," or words to that effect.

f.    On or about July 17, 2013, Plaintiff had another meeting with Plaintiff's supervisor, Mr. Sheibley, who confirmed that Plaintiff could not be fully open and should be discreet, or words to that effect, from that point moving forward, about who Plaintiff told, and regarding who would find out about Plaintiff's relationship with and upcoming marriage to a person of the same sex (female).

g.    On or about July 22, 2013, Plaintiff met again with Mr. Springs Steele, Vice President for Mission and Identity, and Plaintiff told Mr. Steele that Plaintiff was experiencing stress and anxiety on account of the fact that the University's request of Plaintiff not to be public was unclear, or words to that effect.  Plaintiff stated to Mr. Steele that Plaintiff would feel more comfortable if she had something in writing from the University moving forward about Plaintiff's job security, and Plaintiff asked Mr. Steele for clarification in writing about what Plaintiff was allowed to do, and what Plaintiff was not allowed to do, with regard to how Plaintiff was supposed to act as an employee, or words to that effect.  Mr. Steele seemed dismissive and responded, "Well, good luck with that," "You're not going to get that," or "You'll never get that in writing," or words to that effect.

h.    The next day, on July 23, 2013, Plaintiff filed a formal written complaint of discrimination, by e-mail, with Ms. Susan Eisenmann, Vice President of Human Resources.  Later the same day, on July 23, 2013, Plaintiff and

Ms. Eisenmann had an in-person meeting to discuss Plaintiff's complaint. During the meeting, Ms. Eisenmann explained that what Plaintiff was experiencing was not discrimination.

i. On August 5, 2013, Ms. Eisenmann, Vice President of Human Resources, wrote and delivered a letter to Plaintiff confirming that Defendant did not consider what Plaintiff was experiencing to be discrimination. And, although Ms. Eisenmann confirmed that Plaintiff was not being terminated at that time, Plaintiff was required to abide by the terms and conditions imposed by Defendant moving forward.

j. The Defendant's hateful and harassing conduct toward Plaintiff tormented Plaintiff and was a stress factor that caused her to attempt suicide approximately six (6) days later, on or about August 11, 2013. Plaintiff was hospitalized following the suicide attempt. The medical record for Plaintiff's hospitalization states that Plaintiff's depression and suicide attempt were allegedly due to, in part, "job stress." Plaintiff was asked by her providers to indicate the "places" which were Plaintiff's "triggers," and Plaintiff indicated one (1) such place – "Work." Plaintiff was seriously damaged by the harassment and abuse Plaintiff experienced in being required to remain closeted or hide Plaintiff's relationship with and upcoming marriage to a person of the same sex (female), for fear of the negative consequences or repercussions if Plaintiff was suspected or found out.

k.    To attempt to comply with the University's request regarding the
Plaintiff's Facebook account, Plaintiff did go through Plaintiff's Facebook
friends and remove any of Plaintiff's Facebook friends from Saint
Joseph's University, except for a limited number who Plaintiff specifically
selected because Plaintiff believed they would not have a problem with
someone being in a relationship with or married to a person of the same
sex (female).

l.    Throughout Plaintiff's employment, on a frequent basis, Plaintiff recalls
specifically refraining or stopping herself from using pronouns of the same
gender to describe Plaintiff's wife at the time, in certain conversations at
work, such as with certain co-employees, faculty and staff members,
Board members, and visitors.  Plaintiff constantly had to determine who
might disapprove, and then act accordingly.  Plaintiff frequently caught
herself and frequently corrected herself from referring to Plaintiff's wife at
the time as "she" or "her."  Plaintiff recalls, for example, an occasion
where Plaintiff remembered mid-sentence that Plaintiff needed to avoid
using "she" or "her" on that occasion at work when referring to Plaintiff's
wife at the time.

m.   Plaintiff also recalls occasions where Plaintiff would intentionally adopt
the pronouns "he" or "him" to specifically refer to Plaintiff's wife at the
time.

n.    Plaintiff further recalls that there were frequent occasions where Plaintiff's
wife at the time would be referred to as "he" or "him" by others, assuming

26

that Plaintiff was married to a man instead of a woman, and Plaintiff

would not correct the assumption, and instead go along with it

intentionally, for fear of the negative consequences or repercussions if

Plaintiff was suspected or found out.  With respect to the above, including

sub-sections (l) through (n), Plaintiff did come out to a certain number of

select co-employees with whom Plaintiff worked closely as it is difficult if

not virtually impossible to remain closeted at all times and around every

single person.

o.   Plaintiff recollects that, during Plaintiff's employment, a male priest saw

Plaintiff speaking to another woman, and he approached Plaintiff and

wanted to know specifically whether Plaintiff had a conversation about

Plaintiff's same-sex partner, and if Plaintiff did, then how exactly Plaintiff

went about the conversation, or words to that effect.  Plaintiff responded

that Plaintiff went along with the person's assumption that Plaintiff was

engaged to a man, or words to that effect.  Plaintiff did so out of fear of

the negative consequences or repercussions if Plaintiff was suspected or

found out.  Plaintiff recollects that the response was, "That's good that you

did that," or "That was a good choice," or words to that effect.  Plaintiff

recalls feeling sick.  In addition, Plaintiff had to make a mental note that

this particular woman believed Plaintiff was going to be married to a man,

in order to keep up the appearance moving forward.  Plaintiff recalls

seeing this particular woman, thus having to keep up such an appearance,

on multiple separate occasions.

27

p.      On another separate occasion, Plaintiff recalls that a woman who was a donor at a campus event saw Plaintiff's ring and asked a series of questions like, "What's his name?" and "What does he do?", assuming that Plaintiff was getting married to a man.  Plaintiff did not correct the assumption intentionally.  Plaintiff again had to make a mental note that this person believed Plaintiff was going to be married to a man, so Plaintiff would have to keep up this appearance with the person moving forward.

q.      During Plaintiff's employment, following news of an employee of a local Catholic high school, the Waldron Mercy Academy, terminating the employment of Ms. Margie Winters, on account of Ms. Winters' marriage to a person of the same sex (female), a co-employee approached Plaintiff during work hours, and asked Plaintiff if Plaintiff was concerned about Plaintiff's own employment, or words to that effect.  Plaintiff felt isolated, singled out, and feared for the negative consequences or repercussions if Plaintiff was suspected or found out.

r.      During Plaintiff's employment, Plaintiff recollects that a co-employee who is a gay male, and who subsequently left Saint Joseph's University, stated to Plaintiff, on multiple occasions, that the co-employee no longer wanted to hide the co-employee's relationship with his boyfriend moving forward, or words to that effect.

s.      During Plaintiff's employment, Plaintiff recollects that another co-employee who was a lesbian stated to Plaintiff that the co-employee saw

28

everything that the Plaintiff was going through at Saint Joseph's University, and therefore the co-employee decided that the co-employee was "not going to come out," or words to that effect. This again caused Plaintiff emotional pain and fear for the negative consequences or repercussions if Plaintiff was suspected or found out.

t.   Plaintiff recollects that Plaintiff was forwarded a document by a priest on staff at Saint Joseph's University, in or around July 2016, which indicated that anyone living an "openly same-sex lifestyle" could not have a leadership role, or words to that effect.

u.   Plaintiff also recollects being approached during Plaintiff's employment by a co-employee and asked specifically whether Plaintiff was aware of the above document stating that anyone living in a same-sex relationship could not have a leadership role, or words to that effect.

v.   Plaintiff's stress and fear of the negative consequences or repercussions if Plaintiff was suspected or found out also extended to non-work-related activities, on non-work-related time, because Plaintiff felt she could not always be fully open outside of work about Plaintiff's employment, or relationship with and marriage to a person of the same sex (female), on account of Defendant's conduct.

w.   Plaintiff also recollects that Plaintiff declined to attend after-hours social activities with coworkers, or attended and then left as quickly as possible, continuing throughout the last year of Plaintiff's employment in 2016-2017.

29

x.      In or around Summer 2017, Plaintiff was scheduled to cover an orientation session attended by parents of students immediately following a Parent Resource Fair.  Plaintiff recollects being approached by Plaintiff's supervisor, Mr. Sheibley, who stated to Plaintiff that a parent had asked whether Defendant "taught anything that wasn't in line with Catholic teaching concerning LGBT issues," or words to that effect.  Plaintiff felt isolated and singled out based on Plaintiff's sexual orientation because Plaintiff felt Mr. Sheibley wanted to ensure that Plaintiff would not be suspected or found out during the session.

y.      Plaintiff recalls that, frequently during Plaintiff's tenure, Plaintiff intentionally limited her participation in events which involved LGBTQ+ issues, such as, for example, Unity Week, Speak Out, or Gay-Straight Alliance ("GSA") events, for fear of the negative consequences or repercussions.

z.      In or around 2016, Plaintiff recollects that one of the Defendant's administrative assistants approached Plaintiff, in a concerned manner, and stated that Public Safety was downstairs.  The assistant did not specifically provide any reason why Public Safety would have been called.  Plaintiff had not called them.  Plaintiff was not aware of any explanation for why Public Safety would have been present.  Plaintiff actually thought momentarily that Plaintiff's employment was over, and Plaintiff was going to be officially escorted off campus.

aa.     Plaintiff recalls, in or around July or August 2017, before Plaintiff's leave
        of absence which preceded her constructive discharge, Plaintiff was at a
        conference on campus where Plaintiff observed the presenters were free to
        discuss their personal lives at work in a way Plaintiff was not.  Plaintiff
        described feeling "overcome with sadness" on this specific occasion.
        Plaintiff also felt she could not tell anyone at work how Plaintiff felt for
        fear Plaintiff would be suspected or found out.

bb.     To add insult to injury, Plaintiff recalls, in or around July or August 2017,
        Plaintiff believes around the same timeframe as the above conference, and
        Plaintiff believes possibly during the same week, Plaintiff was asked by an
        intern to go to dinner with the intern and their family member.  Plaintiff
        found herself again having to hide the fact that Plaintiff identified as a
        lesbian.

cc.     Additionally, Plaintiff recalls, in or around the same timeframe of July or
        August 2017, Plaintiff felt she could not be fully open at a work-related
        lunch meeting held outside of the office and at Plaintiff's supervisor, Mr.
        Sheibley's, request, on account of the presence of a newly hired employee.
        Plaintiff, a co-employee, and a newly hired employee went out to a lunch
        meeting together at their supervisor, Mr. Sheibley's, request.  The co-
        employee who attended the lunch meeting with Plaintiff was the same co-
        employee, as above, who stated to Plaintiff that the co-employee was "not
        going to come out" on account of what Plaintiff was going through at
        Saint Joseph's University, or words to that effect.  It could not necessarily

31

be determined whether the newly hired employee was comfortable with people who are LGBTQ+.  To Plaintiff it was understood that Plaintiff was not to mention Plaintiff's then-wife intentionally, and Plaintiff felt like the conversation was intentionally steered away from Plaintiff's then-wife, as well as the co-employee's personal life, and anything involving personal lives outside of work, on account of the new hire being present.

dd.    The difficulty in trying to maintain a secret double-life by incessantly navigating who to tell and who not to tell, both inside and outside of work, took an immense psychological toll on the Plaintiff.

ee.    Plaintiff requested and was approved for a leave of absence, under the Family and Medical Leave Act ("FMLA"), for Plaintiff's own serious health condition – specifically, for "PTSD [Post-Traumatic Stress Disorder] related trauma" – on account of the harassment Plaintiff suffered.  Plaintiff's leave of absence was scheduled to begin in or around August 14, 2017.

ff.    Plaintiff received partial hospitalization care from on or about August 17, 2017 through September 6, 2017, and was also hospitalized for an inpatient stay from on or about September 7, 2017 through September 11, 2017, all during Plaintiff's leave of absence preceding the Plaintiff's constructive discharge.  Plaintiff underwent therapy for trauma with a focus specifically on sexual orientation and identity issues.  The therapist emphasized that what Plaintiff was being asked to do by Defendant was damaging and not conducive to Plaintiff's psychological well-being.

32

gg.    Plaintiff's then-spouse of the same sex (female), from the Plaintiff's
remarriage, actually stated to Plaintiff, "I will divorce you if you go back
there" – meaning, Saint Joseph's University – and, "I can't stand to see
you continue to suffer like this," or words to that effect, in or around late
2017, during Plaintiff's leave of absence preceding the Plaintiff's
constructive discharge.

hh.    On or about October 23, 2017, Plaintiff reached out to Ms. Eisenmann,
Vice President of Human Resources, before Plaintiff's scheduled return-
to-work date.  Plaintiff had tentatively scheduled to return to work on
November 6, 2017.  Plaintiff and Ms. Eisenmann scheduled a meeting for
November 3, 2017.

ii.    On or about November 3, 2017, Ms. Eisenmann and Plaintiff met, and
Plaintiff stated to Ms. Eisenmann that Plaintiff did not wish to return to
work under the terms and conditions being currently imposed, or words to
that effect.  Plaintiff recollects that Plaintiff stated to Ms. Eisenmann that
Plaintiff felt that Saint Joseph's University was "not a safe environment,"
or words to that effect.  Plaintiff also specifically told Ms. Eisenmann
about the particular impact that the conduct was having on Plaintiff's
psychological well-being including previously being hospitalized and
experiencing emotional distress.  Plaintiff could not return unless on the
terms and conditions imposed.  There was an inquiry about a severance
and Ms. Eisenmann said she would need to check with the University.

jj.     On or about November 9, 2017, Plaintiff; Mr. Sheibley, Plaintiff's
supervisor who had delivered the request for Plaintiff to remain discreet;
and Ms. Eisenmann, Vice President of Human Resources, met formally
regarding Plaintiff's intent to resign because the terms and conditions
imposed on Plaintiff could not be lifted.  Plaintiff did not know
beforehand that Mr. Sheibley was going to be present for the meeting.
Plaintiff had written out a statement beforehand entitled, "My account of
the past 4 years," which Plaintiff read aloud to Ms. Eisenmann and Mr.
Sheibley, during the meeting on November 9, 2017, about Plaintiff's
intent to resign.  Plaintiff stated that Plaintiff felt "stigma in my
workplace," there was "documented concern about my position with
regards to my sexual orientation," "my work environment has not been
safe under these conditions," Plaintiff felt required to "work as someone I
am not," and stating specifically that Plaintiff was struggling with suicide
ideation on account of the Defendant's conduct.  Plaintiff explained that it
took a significant amount of time and energy to navigate or keep up this
secret double-life, and stated, "Am I being discreet enough … what does
that ambiguous phrase mean?  Am I gay or straight today?  Gay or straight
with this person or this group of people?" (ellipsis in original).  Plaintiff
provided a range of examples of a number of different ways that one's
personal life could come up at work, from a "seemingly harmless question
about your spouse," to "what you did this weekend," to a "revelation about
how you have learned to love."  Plaintiff stated, "Asking for discretion

about a life I celebrate and know to be fundamentally good solely because of my sexual orientation is **harassment**" and a "**hostile work environment**" (emphasis added).  Plaintiff expressed, "I have lived as two different people for years," and, "I found myself no longer wanting to live."  Plaintiff was constructively discharged from employment at Saint Joseph's University.

kk.  On November 9, 2017, Plaintiff was presented a severance agreement by Defendant indicating Plaintiff's effective date of resignation was November 15, 2017.  Plaintiff was presented a proposed severance of seventeen-thousand, eight-hundred dollars ($17,800.00), to release Defendant from any and all claims including those specifically based on "employment discrimination or fair employment practices laws, such as Title VII of the Civil Rights Act of 1964 . . . ," which prohibits sexual harassment.  The agreement also stated that Plaintiff was required to keep the agreement "completely confidential" including to "local, state, or federal agencies, members of the press and media, present and former officers, employees, and agents of Saint Joseph's, and other members of the public," about, *inter alia*, "the substance or the existence of any belief that Saint Joseph's allegedly engaged in any unlawful or unfair conduct" toward the Plaintiff.

ll.  Plaintiff was given three (3) choices:  First, Plaintiff could sign the agreement and return it specifically to Mr. Sheibley, the supervisor involved.  Second, if Plaintiff did not sign the agreement and did not

return to work, then the University would accept that as Plaintiff's resignation.  Third, Plaintiff could return to work but only under the existing terms and conditions imposed.

mm.   Plaintiff did *not* sign the agreement.  Plaintiff further rejected the agreement specifically on November 13, 2017, in a letter to Ms. Eisenmann, Vice President of Human Resources, stating, "I am declining your offer of severance as I do not agree with the terms and conditions stated in the Agreement & General Release."  Rather, Plaintiff is pursuing the instant case to ensure that *no* other employee in the future is subjected to hateful harassment and abuse like the Plaintiff was subjected to in this case.

**WHEREFORE**, Plaintiff, Noel Koenke, demands judgment in her favor and against Defendant in an amount which will fully and fairly compensate Plaintiff for any and all back and front pay and benefits; compensatory damages for pain and suffering, mental anguish, anxiety, depression, humiliation, embarrassment, and severe emotional distress; medical and other related expenses; expenses incurred in attending professional counseling; pre- and post-judgment interest, reasonable attorneys' fees, costs of suit; equitable/injunctive relief requiring that Defendant adopt and enforce a clear and unambiguous policy of anti-harassment which is fully LGBT-inclusive and covers all employees and all forms of sexual-orientation harassment or abuse; requiring training in anti-harassment for all employees which is fully LGBT-inclusive, including training on the fact that all forms of sexual-orientation harassment or abuse constitute sexual harassment or abuse, and that the prohibition on anti-harassment extends to all employees; and requiring Defendant to post notice of the verdict in this matter.

**COUNT III:**
**CONSTRUCTIVE DISCHARGE ON ACCOUNT OF SEXUAL HARASSMENT**
**IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**20 U.S.C. § 1681, et seq.**
**(Plaintiff, Noel Koenke v. Defendant, Saint Joseph's University)**

28.     All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth herein at length.

29.     Plaintiff was constructively discharged from employment on account of the severe work-induced anxiety and job-related emotional distress Plaintiff suffered on account of the hateful harassing conduct imposed on Plaintiff by Defendant as a term or condition of Plaintiff's employment, and which constitutes sexual harassment or abuse.  The facts which support Plaintiff's claim of constructive discharge are as follows:

a.     On or about July 12, 2013, Plaintiff's male supervisor, Mr. Thomas Sheibley, Director of Campus Ministry, came into Plaintiff's office, shut the door, and stated that Mr. Sheibley needed to speak to Plaintiff then. Mr. Sheibley informed Plaintiff that the Defendant's administration was asking for Plaintiff not to be public, from that point moving forward, about Plaintiff's relationship with and upcoming marriage to a person of the same sex (female).  Plaintiff recollects that Mr. Sheibley told Plaintiff, for example, that Plaintiff should delete her current Facebook account, create a new Facebook account, but not add any of the employees of Defendant's University to be Plaintiff's Facebook friends.  Plaintiff felt not only that she could not be fully open at work, but also that she could not always be fully open outside of work about Plaintiff's employment, or relationship

37

with and upcoming marriage to a person of the same sex (female), to be consistent with the University's request.

b.    Plaintiff cried during the meeting with Plaintiff's supervisor, Mr. Sheibley, on July 12, 2013, and Plaintiff stated to Mr. Sheibley, "It feels like I'm being asked to go back into the closet," or words to that effect.  Mr. Sheibley agreed this was what it appeared the University was asking Plaintiff to do, by stating, "I know that's how this seems," or words to that effect.  Mr. Sheibley stated to Plaintiff that it was not Mr. Sheibley's personal decision, but that Mr. Sheibley was being required to deliver the request to Plaintiff from the University.

c.    Based on the fact that Defendant had Plaintiff's supervisor deliver the message on behalf of Defendant, this harmed the relationship between Plaintiff and Plaintiff's supervisor, on a frequent basis, during Plaintiff's employment, moving forward.  Plaintiff's supervisor was no longer felt to be her mentor after this.  Plaintiff intentionally limited Plaintiff's interactions with Plaintiff's supervisor moving forward.  This made it extremely difficult for Plaintiff.

d.    Plaintiff generally knew which of her coworkers were married because they were permitted to speak openly about their personal lives at work. Plaintiff recollects that, in or around the same timeframe, co-employee, Ms. Beth Ford, was marrying a person of the opposite sex (male), and was permitted to tell Defendant's students and employees including Plaintiff about this fact.  Ms. Ford did not have a sit-down with her supervisor

where Ms. Ford was asked to be discreet.  Ms. Ford was permitted to be

fully open.  As a result, Plaintiff suffered emotional pain and humiliation

about her own situation.

e.      On or about July 12, 2013, following Plaintiff's meeting with Plaintiff's

supervisor, Mr. Sheibley, Plaintiff reported the conduct to Mr. Springs

Steele, Vice President for Mission and Identity, who stated to Plaintiff,

"That wasn't handled well," or words to that effect.

f.      On or about July 17, 2013, Plaintiff had another meeting with Plaintiff's

supervisor, Mr. Sheibley, who confirmed that Plaintiff could not be fully

open and should be discreet, or words to that effect, from that point

moving forward, about who Plaintiff told, and regarding who would find

out about Plaintiff's relationship with and upcoming marriage to a person

of the same sex (female).

g.      On or about July 22, 2013, Plaintiff met again with Mr. Springs Steele,

Vice President for Mission and Identity, and Plaintiff told Mr. Steele that

Plaintiff was experiencing stress and anxiety on account of the fact that the

University's request of Plaintiff not to be public was unclear, or words to

that effect.  Plaintiff stated to Mr. Steele that Plaintiff would feel more

comfortable if she had something in writing from the University moving

forward about Plaintiff's job security, and Plaintiff asked Mr. Steele for

clarification in writing about what Plaintiff was allowed to do, and what

Plaintiff was not allowed to do, with regard to how Plaintiff was supposed

to act as an employee, or words to that effect.  Mr. Steele seemed

39

dismissive and responded, "Well, good luck with that," "You're not going to get that," or "You'll never get that in writing," or words to that effect.

h.   The next day, on July 23, 2013, Plaintiff filed a formal written complaint of discrimination, by e-mail, with Ms. Susan Eisenmann, Vice President of Human Resources.  Later the same day, on July 23, 2013, Plaintiff and Ms. Eisenmann had an in-person meeting to discuss Plaintiff's complaint. During the meeting, Ms. Eisenmann explained that what Plaintiff was experiencing was not discrimination.

i.   On August 5, 2013, Ms. Eisenmann, Vice President of Human Resources, wrote and delivered a letter to Plaintiff confirming that Defendant did not consider what Plaintiff was experiencing to be discrimination.  And, although Ms. Eisenmann confirmed that Plaintiff was not being terminated at that time, Plaintiff was required to abide by the terms and conditions imposed by Defendant moving forward.

j.   The Defendant's hateful and harassing conduct toward Plaintiff tormented Plaintiff and was a stress factor that caused her to attempt suicide approximately six (6) days later, on or about August 11, 2013.  Plaintiff was hospitalized following the suicide attempt.  The medical record for Plaintiff's hospitalization states that Plaintiff's depression and suicide attempt were allegedly due to, in part, "job stress."  Plaintiff was asked by her providers to indicate the "places" which were Plaintiff's "triggers," and Plaintiff indicated one (1) such place – "Work."  Plaintiff was seriously damaged by the harassment and abuse Plaintiff experienced in

40

being required to remain closeted or hide Plaintiff's relationship with and upcoming marriage to a person of the same sex (female), for fear of the negative consequences or repercussions if Plaintiff was suspected or found out.

k.   To attempt to comply with the University's request regarding the Plaintiff's Facebook account, Plaintiff did go through Plaintiff's Facebook friends and remove any of Plaintiff's Facebook friends from Saint Joseph's University, except for a limited number who Plaintiff specifically selected because Plaintiff believed they would not have a problem with someone being in a relationship with or married to a person of the same sex (female).

l.   Throughout Plaintiff's employment, on a frequent basis, Plaintiff recalls specifically refraining or stopping herself from using pronouns of the same gender to describe Plaintiff's wife at the time, in certain conversations at work, such as with certain co-employees, faculty and staff members, Board members, and visitors.  Plaintiff constantly had to determine who might disapprove, and then act accordingly.  Plaintiff frequently caught herself and frequently corrected herself from referring to Plaintiff's wife at the time as "she" or "her."  Plaintiff recalls, for example, an occasion where Plaintiff remembered mid-sentence that Plaintiff needed to avoid using "she" or "her" on that occasion at work when referring to Plaintiff's wife at the time.

41

m.     Plaintiff also recalls occasions where Plaintiff would intentionally adopt
the pronouns "he" or "him" to specifically refer to Plaintiff's wife at the
time.

n.     Plaintiff further recalls that there were frequent occasions where Plaintiff's
wife at the time would be referred to as "he" or "him" by others, assuming
that Plaintiff was married to a man instead of a woman, and Plaintiff
would not correct the assumption, and instead go along with it
intentionally, for fear of the negative consequences or repercussions if
Plaintiff was suspected or found out.  With respect to the above, including
sub-sections (l) through (n), Plaintiff did come out to a certain number of
select co-employees with whom Plaintiff worked closely as it is difficult if
not virtually impossible to remain closeted at all times and around every
single person.

o.     Plaintiff recollects that, during Plaintiff's employment, a male priest saw
Plaintiff speaking to another woman, and he approached Plaintiff and
wanted to know specifically whether Plaintiff had a conversation about
Plaintiff's same-sex partner, and if Plaintiff did, then how exactly Plaintiff
went about the conversation, or words to that effect.  Plaintiff responded
that Plaintiff went along with the person's assumption that Plaintiff was
engaged to a man, or words to that effect.  Plaintiff did so out of fear of
the negative consequences or repercussions if Plaintiff was suspected or
found out.  Plaintiff recollects that the response was, "That's good that you
did that," or "That was a good choice," or words to that effect.  Plaintiff

recalls feeling sick.  In addition, Plaintiff had to make a mental note that this particular woman believed Plaintiff was going to be married to a man, in order to keep up the appearance moving forward.  Plaintiff recalls seeing this particular woman, thus having to keep up such an appearance, on multiple separate occasions.

p.      On another separate occasion, Plaintiff recalls that a woman who was a donor at a campus event saw Plaintiff's ring and asked a series of questions like, "What's his name?" and "What does he do?", assuming that Plaintiff was getting married to a man.  Plaintiff did not correct the assumption intentionally.  Plaintiff again had to make a mental note that this person believed Plaintiff was going to be married to a man, so Plaintiff would have to keep up this appearance with the person moving forward.

q.      During Plaintiff's employment, following news of an employee of a local Catholic high school, the Waldron Mercy Academy, terminating the employment of Ms. Margie Winters, on account of Ms. Winters' marriage to a person of the same sex (female), a co-employee approached Plaintiff during work hours, and asked Plaintiff if Plaintiff was concerned about Plaintiff's own employment, or words to that effect.  Plaintiff felt isolated, singled out, and feared for the negative consequences or repercussions if Plaintiff was suspected or found out.

r.      During Plaintiff's employment, Plaintiff recollects that a co-employee who is a gay male, and who subsequently left Saint Joseph's University,

43

stated to Plaintiff, on multiple occasions, that the co-employee no longer wanted to hide the co-employee's relationship with his boyfriend moving forward, or words to that effect.

s.    During Plaintiff's employment, Plaintiff recollects that another co-employee who was a lesbian stated to Plaintiff that the co-employee saw everything that the Plaintiff was going through at Saint Joseph's University, and therefore the co-employee decided that the co-employee was "not going to come out," or words to that effect.  This again caused Plaintiff emotional pain and fear for the negative consequences or repercussions if Plaintiff was suspected or found out.

t.    Plaintiff recollects that Plaintiff was forwarded a document by a priest on staff at Saint Joseph's University, in or around July 2016, which indicated that anyone living an "openly same-sex lifestyle" could not have a leadership role, or words to that effect.

u.    Plaintiff also recollects being approached during Plaintiff's employment by a co-employee and asked specifically whether Plaintiff was aware of the above document stating that anyone living in a same-sex relationship could not have a leadership role, or words to that effect.

v.    Plaintiff's stress and fear of the negative consequences or repercussions if Plaintiff was suspected or found out also extended to non-work-related activities, on non-work-related time, because Plaintiff felt she could not always be fully open outside of work about Plaintiff's employment, or

44

relationship with and marriage to a person of the same sex (female), on account of Defendant's conduct.

w.      Plaintiff also recollects that Plaintiff declined to attend after-hours social activities with coworkers, or attended and then left as quickly as possible, continuing throughout the last year of Plaintiff's employment in 2016-2017.

x.      In or around Summer 2017, Plaintiff was scheduled to cover an orientation session attended by parents of students immediately following a Parent Resource Fair.  Plaintiff recollects being approached by Plaintiff's supervisor, Mr. Sheibley, who stated to Plaintiff that a parent had asked whether Defendant "taught anything that wasn't in line with Catholic teaching concerning LGBT issues," or words to that effect.  Plaintiff felt isolated and singled out based on Plaintiff's sexual orientation because Plaintiff felt Mr. Sheibley wanted to ensure that Plaintiff would not be suspected or found out during the session.

y.      Plaintiff recalls that, frequently during Plaintiff's tenure, Plaintiff intentionally limited her participation in events which involved LGBTQ+ issues, such as, for example, Unity Week, Speak Out, or Gay-Straight Alliance ("GSA") events, for fear of the negative consequences or repercussions.

z.      In or around 2016, Plaintiff recollects that one of the Defendant's administrative assistants approached Plaintiff, in a concerned manner, and stated that Public Safety was downstairs.  The assistant did not specifically

45

provide any reason why Public Safety would have been called.  Plaintiff had not called them.  Plaintiff was not aware of any explanation for why Public Safety would have been present.  Plaintiff actually thought momentarily that Plaintiff's employment was over, and Plaintiff was going to be officially escorted off campus.

aa.   Plaintiff recalls, in or around July or August 2017, before Plaintiff's leave of absence which preceded her constructive discharge, Plaintiff was at a conference on campus where Plaintiff observed the presenters were free to discuss their personal lives at work in a way Plaintiff was not.  Plaintiff described feeling "overcome with sadness" on this specific occasion. Plaintiff also felt she could not tell anyone at work how Plaintiff felt for fear Plaintiff would be suspected or found out.

bb.   To add insult to injury, Plaintiff recalls, in or around July or August 2017, Plaintiff believes around the same timeframe as the above conference, and Plaintiff believes possibly during the same week, Plaintiff was asked by an intern to go to dinner with the intern and their family member.  Plaintiff found herself again having to hide the fact that Plaintiff identified as a lesbian.

cc.   Additionally, Plaintiff recalls, in or around the same timeframe of July or August 2017, Plaintiff felt she could not be fully open at a work-related lunch meeting held outside of the office and at Plaintiff's supervisor, Mr. Sheibley's, request, on account of the presence of a newly hired employee. Plaintiff, a co-employee, and a newly hired employee went out to a lunch

46

meeting together at their supervisor, Mr. Sheibley's, request. The co-employee who attended the lunch meeting with Plaintiff was the same co-employee, as above, who stated to Plaintiff that the co-employee was "not going to come out" on account of what Plaintiff was going through at Saint Joseph's University, or words to that effect. It could not necessarily be determined whether the newly hired employee was comfortable with people who are LGBTQ+. To Plaintiff it was understood that Plaintiff was not to mention Plaintiff's then-wife intentionally, and Plaintiff felt like the conversation was intentionally steered away from Plaintiff's then-wife, as well as the co-employee's personal life, and anything involving personal lives outside of work, on account of the new hire being present.

dd.    The difficulty in trying to maintain a secret double-life by incessantly navigating who to tell and who not to tell, both inside and outside of work, took an immense psychological toll on the Plaintiff.

ee.    Plaintiff requested and was approved for a leave of absence, under the Family and Medical Leave Act ("FMLA"), for Plaintiff's own serious health condition – specifically, for "PTSD [Post-Traumatic Stress Disorder] related trauma" – on account of the harassment Plaintiff suffered. Plaintiff's leave of absence was scheduled to begin in or around August 14, 2017.

ff.    Plaintiff received partial hospitalization care from on or about August 17, 2017 through September 6, 2017, and was also hospitalized for an inpatient stay from on or about September 7, 2017 through September 11,

47

2017, all during Plaintiff's leave of absence preceding the Plaintiff's
constructive discharge.  Plaintiff underwent therapy for trauma with a
focus specifically on sexual orientation and identity issues.  The therapist
emphasized that what Plaintiff was being asked to do by Defendant was
damaging and not conducive to Plaintiff's psychological well-being.

gg.   Plaintiff's then-spouse of the same sex (female), from the Plaintiff's
remarriage, actually stated to Plaintiff, "I will divorce you if you go back
there" – meaning, Saint Joseph's University – and, "I can't stand to see
you continue to suffer like this," or words to that effect, in or around late
2017, during Plaintiff's leave of absence preceding the Plaintiff's
constructive discharge.

hh.   On or about October 23, 2017, Plaintiff reached out to Ms. Eisenmann,
Vice President of Human Resources, before Plaintiff's scheduled return-
to-work date.  Plaintiff had tentatively scheduled to return to work on
November 6, 2017.  Plaintiff and Ms. Eisenmann scheduled a meeting for
November 3, 2017.

ii.   On or about November 3, 2017, Ms. Eisenmann and Plaintiff met, and
Plaintiff stated to Ms. Eisenmann that Plaintiff did not wish to return to
work under the terms and conditions being currently imposed, or words to
that effect.  Plaintiff recollects that Plaintiff stated to Ms. Eisenmann that
Plaintiff felt that Saint Joseph's University was "not a safe environment,"
or words to that effect.  Plaintiff also specifically told Ms. Eisenmann
about the particular impact that the conduct was having on Plaintiff's

48

psychological well-being including previously being hospitalized and experiencing emotional distress. Plaintiff could not return unless on the terms and conditions imposed. There was an inquiry about a severance and Ms. Eisenmann said she would need to check with the University.

jj.    On or about November 9, 2017, Plaintiff; Mr. Sheibley, Plaintiff's supervisor who had delivered the request for Plaintiff to remain discreet; and Ms. Eisenmann, Vice President of Human Resources, met formally regarding Plaintiff's intent to resign because the terms and conditions imposed on Plaintiff could not be lifted. Plaintiff did not know beforehand that Mr. Sheibley was going to be present for the meeting. Plaintiff had written out a statement beforehand entitled, "My account of the past 4 years," which Plaintiff read aloud to Ms. Eisenmann and Mr. Sheibley, during the meeting on November 9, 2017, about Plaintiff's intent to resign. Plaintiff stated that Plaintiff felt "stigma in my workplace," there was "documented concern about my position with regards to my sexual orientation," "my work environment has not been safe under these conditions," Plaintiff felt required to "work as someone I am not," and stating specifically that Plaintiff was struggling with suicide ideation on account of the Defendant's conduct. Plaintiff explained that it took a significant amount of time and energy to navigate or keep up this secret double-life, and stated, "Am I being discreet enough … what does that ambiguous phrase mean? Am I gay or straight today? Gay or straight with this person or this group of people?" (ellipsis in original). Plaintiff

49

provided a range of examples of a number of different ways that one's
personal life could come up at work, from a "seemingly harmless question
about your spouse," to "what you did this weekend," to a "revelation about
how you have learned to love." Plaintiff stated, "Asking for discretion
about a life I celebrate and know to be fundamentally good solely because
of my sexual orientation is **harassment**" and a "**hostile work
environment**" (emphasis added). Plaintiff expressed, "I have lived as two
different people for years," and, "I found myself no longer wanting to
live." Plaintiff was constructively discharged from employment at Saint
Joseph's University.

kk.   On November 9, 2017, Plaintiff was presented a severance agreement by
Defendant indicating Plaintiff's effective date of resignation was
November 15, 2017. Plaintiff was presented a proposed severance of
seventeen-thousand, eight-hundred dollars ($17,800.00), to release
Defendant from any and all claims including those specifically based on
"employment discrimination or fair employment practices laws, such as
Title VII of the Civil Rights Act of 1964 . . . ," which prohibits sexual
harassment. The agreement also stated that Plaintiff was required to keep
the agreement "completely confidential" including to "local, state, or
federal agencies, members of the press and media, present and former
officers, employees, and agents of Saint Joseph's, and other members of
the public," about, *inter alia*, "the substance or the existence of any belief

that Saint Joseph's allegedly engaged in any unlawful or unfair conduct"
toward the Plaintiff.

ll.     Plaintiff was given three (3) choices:  First, Plaintiff could sign the
agreement and return it specifically to Mr. Sheibley, the supervisor
involved.  Second, if Plaintiff did not sign the agreement and did not
return to work, then the University would accept that as Plaintiff's
resignation.  Third, Plaintiff could return to work but only under the
existing terms and conditions imposed.

mm.     Plaintiff did _not_ sign the agreement.  Plaintiff further rejected the
agreement specifically on November 13, 2017, in a letter to Ms.
Eisenmann, Vice President of Human Resources, stating, "I am declining
your offer of severance as I do not agree with the terms and conditions
stated in the Agreement & General Release."  Rather, Plaintiff is pursuing
the instant case to ensure that _no_ other employee in the future is subjected
to hateful harassment and abuse like the Plaintiff was subjected to in this
case.

**WHEREFORE**, Plaintiff, Noel Koenke, demands judgment in her favor and against
Defendant in an amount which will fully and fairly compensate Plaintiff for any and all back and
front pay and benefits; compensatory damages for pain and suffering, mental anguish, anxiety,
depression, humiliation, embarrassment, and severe emotional distress; medical and other related
expenses; expenses incurred in attending professional counseling; pre- and post-judgment
interest, reasonable attorneys' fees, costs of suit; equitable/injunctive relief requiring that
Defendant adopt and enforce a clear and unambiguous policy of anti-harassment which is fully

LGBT-inclusive and covers all employees and all forms of sexual-orientation harassment or abuse; requiring training in anti-harassment for all employees which is fully LGBT-inclusive, including training on the fact that all forms of sexual-orientation harassment or abuse constitute sexual harassment or abuse, and that the prohibition on anti-harassment extends to all employees; and requiring Defendant to post notice of the verdict in this matter.

**COUNT IV:**
**DIFFERENT TERMS, CONDITIONS, AND PRIVILEGES BASED ON SEX, GENDER STEREOTYPING, AND SEXUAL HARASSMENT, IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681, <u>et seq.</u>**
**<u>(Plaintiff, Noel Koenke v. Defendant, Saint Joseph's University)</u>**

30.    All of the foregoing paragraphs are hereby incorporated by reference as if the same were more fully set forth herein at length.

31.    Once having hired Plaintiff, Defendant does <u>*not*</u> have free rein to continuously discriminate, harass, and abuse Plaintiff with impunity based on Plaintiff's sexual orientation, in the terms, conditions, and privileges of Plaintiff's employment, on a daily basis, as Defendant did here.  This is inconsistent with Defendant's own written policy and Title IX.

32.    Throughout the duration of Plaintiff's employment, Defendant subjected Plaintiff to different terms, conditions, and privileges on account of sex, gender stereotyping, and sexual harassment, and conditioned Plaintiff's continued employment on the same, to wit:

    a.    On or about July 12, 2013, Plaintiff's male supervisor, Mr. Thomas Sheibley, Director of Campus Ministry, came into Plaintiff's office, shut the door, and stated that Mr. Sheibley needed to speak to Plaintiff then. Mr. Sheibley informed Plaintiff that the Defendant's administration was asking for Plaintiff not to be public, from that point moving forward, about Plaintiff's relationship with and upcoming marriage to a person of the

same sex (female).  Plaintiff recollects that Mr. Sheibley told Plaintiff, for example, that Plaintiff should delete her current Facebook account, create a new Facebook account, but not add any of the employees of Defendant's University to be Plaintiff's Facebook friends.  Plaintiff felt not only that she could not be fully open at work, but also that she could not always be fully open outside of work about Plaintiff's employment, or relationship with and upcoming marriage to a person of the same sex (female), to be consistent with the University's request.

b.  Plaintiff cried during the meeting with Plaintiff's supervisor, Mr. Sheibley, on July 12, 2013, and Plaintiff stated to Mr. Sheibley, "It feels like I'm being asked to go back into the closet," or words to that effect.  Mr. Sheibley agreed this was what it appeared the University was asking Plaintiff to do, by stating, "I know that's how this seems," or words to that effect.  Mr. Sheibley stated to Plaintiff that it was not Mr. Sheibley's personal decision, but that Mr. Sheibley was being required to deliver the request to Plaintiff from the University.

c.  Based on the fact that Defendant had Plaintiff's supervisor deliver the message on behalf of Defendant, this harmed the relationship between Plaintiff and Plaintiff's supervisor, on a frequent basis, during Plaintiff's employment, moving forward.  Plaintiff's supervisor was no longer felt to be her mentor after this.  Plaintiff intentionally limited Plaintiff's interactions with Plaintiff's supervisor moving forward.  This made it extremely difficult for Plaintiff.

53

d.  Plaintiff generally knew which of her coworkers were married because they were permitted to speak openly about their personal lives at work. Plaintiff recollects that, in or around the same timeframe, co-employee, Ms. Beth Ford, was marrying a person of the opposite sex (male), and was permitted to tell Defendant's students and employees including Plaintiff about this fact.  Ms. Ford did not have a sit-down with her supervisor where Ms. Ford was asked to be discreet.  Ms. Ford was permitted to be fully open.  As a result, Plaintiff suffered emotional pain and humiliation about her own situation.

e.  On or about July 12, 2013, following Plaintiff's meeting with Plaintiff's supervisor, Mr. Sheibley, Plaintiff reported the conduct to Mr. Springs Steele, Vice President for Mission and Identity, who stated to Plaintiff, "That wasn't handled well," or words to that effect.

f.  On or about July 17, 2013, Plaintiff had another meeting with Plaintiff's supervisor, Mr. Sheibley, who confirmed that Plaintiff could not be fully open and should be discreet, or words to that effect, from that point moving forward, about who Plaintiff told, and regarding who would find out about Plaintiff's relationship with and upcoming marriage to a person of the same sex (female).

g.  On or about July 22, 2013, Plaintiff met again with Mr. Springs Steele, Vice President for Mission and Identity, and Plaintiff told Mr. Steele that Plaintiff was experiencing stress and anxiety on account of the fact that the University's request of Plaintiff not to be public was unclear, or words to

54

that effect.  Plaintiff stated to Mr. Steele that Plaintiff would feel more comfortable if she had something in writing from the University moving forward about Plaintiff's job security, and Plaintiff asked Mr. Steele for clarification in writing about what Plaintiff was allowed to do, and what Plaintiff was not allowed to do, with regard to how Plaintiff was supposed to act as an employee, or words to that effect.  Mr. Steele seemed dismissive and responded, "Well, good luck with that," "You're not going to get that," or "You'll never get that in writing," or words to that effect.

h.    The next day, on July 23, 2013, Plaintiff filed a formal written complaint of discrimination, by e-mail, with Ms. Susan Eisenmann, Vice President of Human Resources.  Later the same day, on July 23, 2013, Plaintiff and Ms. Eisenmann had an in-person meeting to discuss Plaintiff's complaint. During the meeting, Ms. Eisenmann explained that what Plaintiff was experiencing was not discrimination.

i.    On August 5, 2013, Ms. Eisenmann, Vice President of Human Resources, wrote and delivered a letter to Plaintiff confirming that Defendant did not consider what Plaintiff was experiencing to be discrimination.  And, although Ms. Eisenmann confirmed that Plaintiff was not being terminated at that time, Plaintiff was required to abide by the terms and conditions imposed by Defendant moving forward.

j.    The Defendant's hateful and harassing conduct toward Plaintiff tormented Plaintiff and was a stress factor that caused her to attempt suicide approximately six (6) days later, on or about August 11, 2013.  Plaintiff

was hospitalized following the suicide attempt.  The medical record for Plaintiff's hospitalization states that Plaintiff's depression and suicide attempt were allegedly due to, in part, "job stress."  Plaintiff was asked by her providers to indicate the "places" which were Plaintiff's "triggers," and Plaintiff indicated one (1) such place – "Work."  Plaintiff was seriously damaged by the harassment and abuse Plaintiff experienced in being required to remain closeted or hide Plaintiff's relationship with and upcoming marriage to a person of the same sex (female), for fear of the negative consequences or repercussions if Plaintiff was suspected or found out.

k.      To attempt to comply with the University's request regarding the Plaintiff's Facebook account, Plaintiff did go through Plaintiff's Facebook friends and remove any of Plaintiff's Facebook friends from Saint Joseph's University, except for a limited number who Plaintiff specifically selected because Plaintiff believed they would not have a problem with someone being in a relationship with or married to a person of the same sex (female).

l.      Throughout Plaintiff's employment, on a frequent basis, Plaintiff recalls specifically refraining or stopping herself from using pronouns of the same gender to describe Plaintiff's wife at the time, in certain conversations at work, such as with certain co-employees, faculty and staff members, Board members, and visitors.  Plaintiff constantly had to determine who might disapprove, and then act accordingly.  Plaintiff frequently caught

56

herself and frequently corrected herself from referring to Plaintiff's wife at the time as "she" or "her."  Plaintiff recalls, for example, an occasion where Plaintiff remembered mid-sentence that Plaintiff needed to avoid using "she" or "her" on that occasion at work when referring to Plaintiff's wife at the time.

m.    Plaintiff also recalls occasions where Plaintiff would intentionally adopt the pronouns "he" or "him" to specifically refer to Plaintiff's wife at the time.

n.    Plaintiff further recalls that there were frequent occasions where Plaintiff's wife at the time would be referred to as "he" or "him" by others, assuming that Plaintiff was married to a man instead of a woman, and Plaintiff would not correct the assumption, and instead go along with it intentionally, for fear of the negative consequences or repercussions if Plaintiff was suspected or found out.  With respect to the above, including sub-sections (l) through (n), Plaintiff did come out to a certain number of select co-employees with whom Plaintiff worked closely as it is difficult if not virtually impossible to remain closeted at all times and around every single person.

o.    Plaintiff recollects that, during Plaintiff's employment, a male priest saw Plaintiff speaking to another woman, and he approached Plaintiff and wanted to know specifically whether Plaintiff had a conversation about Plaintiff's same-sex partner, and if Plaintiff did, then how exactly Plaintiff went about the conversation, or words to that effect.  Plaintiff responded

that Plaintiff went along with the person's assumption that Plaintiff was engaged to a man, or words to that effect.  Plaintiff did so out of fear of the negative consequences or repercussions if Plaintiff was suspected or found out.  Plaintiff recollects that the response was, "That's good that you did that," or "That was a good choice," or words to that effect.  Plaintiff recalls feeling sick.  In addition, Plaintiff had to make a mental note that this particular woman believed Plaintiff was going to be married to a man, in order to keep up the appearance moving forward.  Plaintiff recalls seeing this particular woman, thus having to keep up such an appearance, on multiple separate occasions.

p.   On another separate occasion, Plaintiff recalls that a woman who was a donor at a campus event saw Plaintiff's ring and asked a series of questions like, "What's his name?" and "What does he do?", assuming that Plaintiff was getting married to a man.  Plaintiff did not correct the assumption intentionally.  Plaintiff again had to make a mental note that this person believed Plaintiff was going to be married to a man, so Plaintiff would have to keep up this appearance with the person moving forward.

q.   During Plaintiff's employment, following news of an employee of a local Catholic high school, the Waldron Mercy Academy, terminating the employment of Ms. Margie Winters, on account of Ms. Winters' marriage to a person of the same sex (female), a co-employee approached Plaintiff during work hours, and asked Plaintiff if Plaintiff was concerned about

Plaintiff's own employment, or words to that effect.  Plaintiff felt isolated, singled out, and feared for the negative consequences or repercussions if Plaintiff was suspected or found out.

r.      During Plaintiff's employment, Plaintiff recollects that a co-employee who is a gay male, and who subsequently left Saint Joseph's University, stated to Plaintiff, on multiple occasions, that the co-employee no longer wanted to hide the co-employee's relationship with his boyfriend moving forward, or words to that effect.

s.      During Plaintiff's employment, Plaintiff recollects that another co-employee who was a lesbian stated to Plaintiff that the co-employee saw everything that the Plaintiff was going through at Saint Joseph's University, and therefore the co-employee decided that the co-employee was "not going to come out," or words to that effect.  This again caused Plaintiff emotional pain and fear for the negative consequences or repercussions if Plaintiff was suspected or found out.

t.      Plaintiff recollects that Plaintiff was forwarded a document by a priest on staff at Saint Joseph's University, in or around July 2016, which indicated that anyone living an "openly same-sex lifestyle" could not have a leadership role, or words to that effect.

u.      Plaintiff also recollects being approached during Plaintiff's employment by a co-employee and asked specifically whether Plaintiff was aware of the above document stating that anyone living in a same-sex relationship could not have a leadership role, or words to that effect.

59

v.     Plaintiff's stress and fear of the negative consequences or repercussions if Plaintiff was suspected or found out also extended to non-work-related activities, on non-work-related time, because Plaintiff felt she could not always be fully open outside of work about Plaintiff's employment, or relationship with and marriage to a person of the same sex (female), on account of Defendant's conduct.

w.     Plaintiff also recollects that Plaintiff declined to attend after-hours social activities with coworkers, or attended and then left as quickly as possible, continuing throughout the last year of Plaintiff's employment in 2016-2017.

x.     In or around Summer 2017, Plaintiff was scheduled to cover an orientation session attended by parents of students immediately following a Parent Resource Fair.  Plaintiff recollects being approached by Plaintiff's supervisor, Mr. Sheibley, who stated to Plaintiff that a parent had asked whether Defendant "taught anything that wasn't in line with Catholic teaching concerning LGBT issues," or words to that effect.  Plaintiff felt isolated and singled out based on Plaintiff's sexual orientation because Plaintiff felt Mr. Sheibley wanted to ensure that Plaintiff would not be suspected or found out during the session.

y.     Plaintiff recalls that, frequently during Plaintiff's tenure, Plaintiff intentionally limited her participation in events which involved LGBTQ+ issues, such as, for example, Unity Week, Speak Out, or Gay-Straight

Alliance ("GSA") events, for fear of the negative consequences or repercussions.

z.      In or around 2016, Plaintiff recollects that one of the Defendant's administrative assistants approached Plaintiff, in a concerned manner, and stated that Public Safety was downstairs.  The assistant did not specifically provide any reason why Public Safety would have been called.  Plaintiff had not called them.  Plaintiff was not aware of any explanation for why Public Safety would have been present.  Plaintiff actually thought momentarily that Plaintiff's employment was over, and Plaintiff was going to be officially escorted off campus.

aa.     Plaintiff recalls, in or around July or August 2017, before Plaintiff's leave of absence which preceded her constructive discharge, Plaintiff was at a conference on campus where Plaintiff observed the presenters were free to discuss their personal lives at work in a way Plaintiff was not.  Plaintiff described feeling "overcome with sadness" on this specific occasion. Plaintiff also felt she could not tell anyone at work how Plaintiff felt for fear Plaintiff would be suspected or found out.

bb.     To add insult to injury, Plaintiff recalls, in or around July or August 2017, Plaintiff believes around the same timeframe as the above conference, and Plaintiff believes possibly during the same week, Plaintiff was asked by an intern to go to dinner with the intern and their family member.  Plaintiff found herself again having to hide the fact that Plaintiff identified as a lesbian.

cc.   Additionally, Plaintiff recalls, in or around the same timeframe of July or August 2017, Plaintiff felt she could not be fully open at a work-related lunch meeting held outside of the office and at Plaintiff's supervisor, Mr. Sheibley's, request, on account of the presence of a newly hired employee. Plaintiff, a co-employee, and a newly hired employee went out to a lunch meeting together at their supervisor, Mr. Sheibley's, request.  The co-employee who attended the lunch meeting with Plaintiff was the same co-employee, as above, who stated to Plaintiff that the co-employee was "not going to come out" on account of what Plaintiff was going through at Saint Joseph's University, or words to that effect.  It could not necessarily be determined whether the newly hired employee was comfortable with people who are LGBTQ+.  To Plaintiff it was understood that Plaintiff was not to mention Plaintiff's then-wife intentionally, and Plaintiff felt like the conversation was intentionally steered away from Plaintiff's then-wife, as well as the co-employee's personal life, and anything involving personal lives outside of work, on account of the new hire being present.

dd.   The difficulty in trying to maintain a secret double-life by incessantly navigating who to tell and who not to tell, both inside and outside of work, took an immense psychological toll on the Plaintiff.

ee.   Plaintiff requested and was approved for a leave of absence, under the Family and Medical Leave Act ("FMLA"), for Plaintiff's own serious health condition – specifically, for "PTSD [Post-Traumatic Stress Disorder] related trauma" – on account of the harassment Plaintiff

suffered.  Plaintiff's leave of absence was scheduled to begin in or around August 14, 2017.

ff.     Plaintiff received partial hospitalization care from on or about August 17, 2017 through September 6, 2017, and was also hospitalized for an inpatient stay from on or about September 7, 2017 through September 11, 2017, all during Plaintiff's leave of absence preceding the Plaintiff's constructive discharge.  Plaintiff underwent therapy for trauma with a focus specifically on sexual orientation and identity issues.  The therapist emphasized that what Plaintiff was being asked to do by Defendant was damaging and not conducive to Plaintiff's psychological well-being.

gg.     Plaintiff's then-spouse of the same sex (female), from the Plaintiff's remarriage, actually stated to Plaintiff, "I will divorce you if you go back there" – meaning, Saint Joseph's University – and, "I can't stand to see you continue to suffer like this," or words to that effect, in or around late 2017, during Plaintiff's leave of absence preceding the Plaintiff's constructive discharge.

hh.     On or about October 23, 2017, Plaintiff reached out to Ms. Eisenmann, Vice President of Human Resources, before Plaintiff's scheduled return-to-work date.  Plaintiff had tentatively scheduled to return to work on November 6, 2017.  Plaintiff and Ms. Eisenmann scheduled a meeting for November 3, 2017.

ii.     On or about November 3, 2017, Ms. Eisenmann and Plaintiff met, and Plaintiff stated to Ms. Eisenmann that Plaintiff did not wish to return to

63

work under the terms and conditions being currently imposed, or words to that effect.  Plaintiff recollects that Plaintiff stated to Ms. Eisenmann that Plaintiff felt that Saint Joseph's University was "not a safe environment," or words to that effect.  Plaintiff also specifically told Ms. Eisenmann about the particular impact that the conduct was having on Plaintiff's psychological well-being including previously being hospitalized and experiencing emotional distress.  Plaintiff could not return unless on the terms and conditions imposed.  There was an inquiry about a severance and Ms. Eisenmann said she would need to check with the University.

jj.    On or about November 9, 2017, Plaintiff; Mr. Sheibley, Plaintiff's supervisor who had delivered the request for Plaintiff to remain discreet; and Ms. Eisenmann, Vice President of Human Resources, met formally regarding Plaintiff's intent to resign because the terms and conditions imposed on Plaintiff could not be lifted.  Plaintiff did not know beforehand that Mr. Sheibley was going to be present for the meeting. Plaintiff had written out a statement beforehand entitled, "My account of the past 4 years," which Plaintiff read aloud to Ms. Eisenmann and Mr. Sheibley, during the meeting on November 9, 2017, about Plaintiff's intent to resign.  Plaintiff stated that Plaintiff felt "stigma in my workplace," there was "documented concern about my position with regards to my sexual orientation," "my work environment has not been safe under these conditions," Plaintiff felt required to "work as someone I am not," and stating specifically that Plaintiff was struggling with suicide

ideation on account of the Defendant's conduct.  Plaintiff explained that it took a significant amount of time and energy to navigate or keep up this secret double-life, and stated, "Am I being discreet enough … what does that ambiguous phrase mean?  Am I gay or straight today?  Gay or straight with this person or this group of people?" (ellipsis in original).  Plaintiff provided a range of examples of a number of different ways that one's personal life could come up at work, from a "seemingly harmless question about your spouse," to "what you did this weekend," to a "revelation about how you have learned to love."  Plaintiff stated, "Asking for discretion about a life I celebrate and know to be fundamentally good solely because of my sexual orientation is **harassment**" and a "**hostile work environment**" (emphasis added).  Plaintiff expressed, "I have lived as two different people for years," and, "I found myself no longer wanting to live."

kk.   On November 9, 2017, Plaintiff was presented a severance agreement by Defendant indicating Plaintiff's effective date of resignation was November 15, 2017.  Plaintiff was presented a proposed severance of seventeen-thousand, eight-hundred dollars ($17,800.00), to release Defendant from any and all claims including those specifically based on "employment discrimination or fair employment practices laws, such as Title VII of the Civil Rights Act of 1964 . . . ," which prohibits sexual harassment.  The agreement also stated that Plaintiff was required to keep the agreement "completely confidential" including to "local, state, or

federal agencies, members of the press and media, present and former officers, employees, and agents of Saint Joseph's, and other members of the public," about, *inter alia*, "the substance or the existence of any belief that Saint Joseph's allegedly engaged in any unlawful or unfair conduct" toward the Plaintiff.

ll.     Plaintiff did <u>not</u> sign the agreement.  Plaintiff further rejected the agreement specifically on November 13, 2017, in a letter to Ms. Eisenmann, Vice President of Human Resources, stating, "I am declining your offer of severance as I do not agree with the terms and conditions stated in the Agreement & General Release."  Rather, Plaintiff is pursuing the instant case to ensure that <u>no</u> other employee in the future is subjected to hateful harassment and abuse like the Plaintiff was subjected to in this case.

**WHEREFORE**, Plaintiff, Noel Koenke, demands judgment in her favor and against Defendant in an amount which will fully and fairly compensate Plaintiff for any and all back and front pay and benefits; compensatory damages for pain and suffering, mental anguish, anxiety, depression, humiliation, embarrassment, and severe emotional distress; medical and other related expenses; expenses incurred in attending professional counseling; pre- and post-judgment interest, reasonable attorneys' fees, costs of suit; equitable/injunctive relief requiring that Defendant adopt and enforce a clear and unambiguous policy of anti-harassment which is fully LGBT-inclusive and covers all employees and all forms of sexual-orientation harassment or abuse; requiring training in anti-harassment for all employees which is fully LGBT-inclusive, including training on the fact that all forms of sexual-orientation harassment or abuse constitute

sexual harassment or abuse, and that the prohibition on anti-harassment extends to all employees; and requiring Defendant to post notice of the verdict in this matter.

## JURY DEMAND

Plaintiff hereby requests a trial by jury of eight (8) members on all counts so triable.

Respectfully submitted,

**THE LAW OFFICES OF ERIC A. SHORE, P.C.**

DATED: 10/11/2019

JUSTIN F. ROBINETTE, ESQUIRE
Attorney I.D. No. 319829
THE LAW OFFICES OF ERIC A. SHORE, P.C.
Two Penn Center
1500 JFK Boulevard, Suite 1240
Philadelphia, PA 19102
Phone: (215) 944-6121
Fax: (215) 944-6124
JustinR@EricShore.com

*Attorney for Plaintiff, Noel Koenke*

67